**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **BRIANNA TISON,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **V.** | ) | **2:18-CV-00486-MHT-SMD** |
| | ) | **(WO)** |
| **ALACHUA STRAW COMPANY, LLC.,** | ) | |
| | ) | |
| | ) | |
| **DEFENDANT.** | ) | |
| | ) | |
| | ) | |

**PRETRIAL ORDER**

A pretrial conference was held in the above case on March 13, 2020, wherein, or as a result of which, the following proceedings were held and actions taken:

1.   **PARTIES AND TRIAL COUNSEL:** The parties before the Court and designated trial counsel are correctly named as set out below:

| PARTIES | TRIAL COUNSEL |
|---|---|
| Plaintiff | Jon C. Goldfarb, L. William Smith, Christina Malmat, Lieselotte Carmen-Burkes |
| Defendant | Robert Coleman Black, Jr. |

2.   **COUNSEL APPEARING AT PRETRIAL HEARING:** Jon C.

Goldfarb, L. William Smith for plaintiffs; Robert Coleman Black, Jr. for

Defendants.

3.   **JURISDICTION AND VENUE:** This court has subject matter jurisdiction of this action under the following statues, rules, or cases: 28 U.S.C. §§ 1331, 1343, 2201, and 2202; 42 U.S.C. §2000e *et seq*.; 42 U.S.C. § 1981a.  All jurisdictional and procedural requirements prerequisite to maintaining this action have been met. Personal jurisdiction and venue are not contested.

4.   **PLEADINGS:**   The following pleadings and amendments were allowed:

Complaint by Plaintiff and Answer by Defendant.

5.   **CONTENTIONS OF THE PARTIES:**

(a) <u>The Plaintiff:</u> Beginning in March 2017, Plaintiff worked for Defendant as a dispatcher and freight coordinator. Andi Miller, with input from Mason Wade, hired Plaintiff. Miller and Wade co-manage Defendant, which is a company that sells pinestraw wholesale and delivers it with its own fleet of trucks. Miller is the owner of the business, but Wade claims to be a 50% owner. Miller and Wade lived together and dated until the end of 2016; during that year, Miller filed domestic violence charges against Wade after Wade attempted to strangle Miller. To this day, Miller and Wade date "intermittently."

During Plaintiff's employment, Wade sexually harassed her repeatedly. Wade made comments about Plaintiff's appearance and about actions he wanted to do to her, such as "I ought to take my belt off and whoop you."  Plaintiff did her best to ignore Wade when he made sexually harassing comments to her, and she made clear that Wade's sexual and sexist remarks were not welcome and that they made her uncomfortable. Wade grew more irritated as Plaintiff continued ignoring his comments, and he began screaming at her for not saying "Yes, sir," or "No, sir," getting in her face and asking her if she wanted to keep her job.  One day, Wade encountered Plaintiff in an office, closed the blinds, and told Plaintiff, "[w]e are going to have a little Kumbaya moment" and asked her about the nature of their

relationship – specifically, whether the`y would be strictly business or if they could be friends. Plaintiff answered that they would be strictly business, and she became

intimidated and frightened by the situation. She began to cry, and Wade then told Plaintiff that he couldn't stand to see a pretty girl cry. Defendant lacked policies regarding sexual harassment or retaliation and provided no training regarding sexual harassment.

Furthermore, during Plaintiff's employment, Miller and Wade continuously brought Plaintiff into the middle of their abusive relationship. For example, Miller would assign personal tasks to Plaintiff related to keeping tabs on Miller's and Wade's personal relationship.

Around June 4 or 5, Plaintiff approached Miller and reported that Wade was sexually harassing her. Plaintiff told Miller all of the comments. Defendant produced notes allegedly taken by Miller, but these notes misrepresent the conversation, because Plaintiff did in fact tell Miller the identity of the driver who'd told Plaintiff that Wade said he'd like to "tap that ass" as he looked at Plaintiff. Miller later admitted that Plaintiff had told her the identity of the driver, and that she believed Plaintiff was making complaints of sexual harassment. Plaintiff informed Miller that Wade's conduct made her feel uncomfortable. Miller suggested to Plaintiff that she say that a "former employee" was the source of the information regarding Wade's "tap that ass" comment, stating in her deposition that Wade would probably try to fire the employee who did tell Plaintiff about the comment. Miller indeed told  Wade that a former employee had been the one to report the comment to Plaintiff. Miller interviewed Holman about the situation within a few weeks prior to the end of Holman's employment on June 22, 2017.

After Plaintiff reported Wade's conduct to Miller, Miller told Plaintiff she would talk to Wade. Miller spoke to Wade and put a copy of her notes on the situation in his file, but Wade testified he did not know the details of what Plaintiff was alleging until Miller brought both Wade and Plaintiff together for a meeting. During this meeting, Plaintiff confronted Wade about the comments, and she made clear that she found his comments offensive. Wade delivered a half-hearted apology, and admitted to some – but not all – of the sexual comments Plaintiff reported. Wade remained unrepentant and had unspoken reservations.

Prior to reporting sexual harassment, Plaintiff's only writeup was dated April 25th for allegedly missing a "live unload" the day before. Wade testified that

after April 29th, Defendant experienced no more issues with missed loads; Plaintiff also testified she did not make any further mistakes after receiving the writeup. However, Wade allegedly told Miller in June that Plaintiff "just didn't get it. Maybe she might, but she didn't get it this rush," i.e. during the spring rush that had just ended. Therefore, Miller and Wade made the decision to terminate Plaintiff's employment on June 5th – within a day or two of Plaintiff reporting Wade's conduct. Miller told her that "things  were going in a different direction" and that Wade did not think she could "handle it." Miller testified that she was terminated for not performing the tasks that she needed to do, and that the "different direction" was that they were splitting Plaintiff's job into two jobs. After Plaintiff left, her job was split into two jobs. Defendant hired Plaintiff at the start of Defendant's busiest season, which ends around June 10, and Wade testified that he expected there would be a "learning curve" and admitted that during the busy season he lacked sufficient time to train her.

Plaintiff texted Miller on June 7th asking if her termination had anything to do with reporting sexual harassment, and Miller replied, "I don't believe so." After termination, Miller asked her to come back and help with "a few tasks" after Wade had left for his summer vacation.

<u>Plaintiff's Sexual Harassment Claim</u>

To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories. Under the first theory, the plaintiff must prove that the harassment culminated in a "tangible employment action" against her. Under the second or "hostile work environment" theory, the plaintiff must prove that she suffered 'severe or pervasive conduct. A "tangible employment action" is "harassment that culminates in a discharge, demotion, or undesirable reassignment." "An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures." Finally, "if a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of "severe or pervasive."

The Eleventh Circuit has never required an explicit sexual proposition or threat. Rather, a plaintiff has always needed only to show that "the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment." In this Circuit,

"any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision." This means that a "Title VII plaintiff ... may establish her entire case simply by showing that she was ... harassed by a fellow employee, and that the harasser took a tangible employment action against her."

Wade was Plaintiff's supervisor with the authority to take tangible employment actions against her. A jury could infer that his frequent sexual comments and compliments and the "kumbaya moment" when he demanded to know whether they would be strictly business or if they could be friends were expressions of sexual interest meant to initiate a relationship. A reasonable jury could find that after Plaintiff rejected Wade's quid pro quo, he brought about her termination, a tangible employment action, by telling Miller that Plaintiff "just didn't get it," either using Miller as a cat's paw for retaliatory animus or by providing "substantial input" that led Miller to make the decision to terminate Plaintiff.

<u>Plaintiff's Hostile Work Environment Theory.</u>

Alternately, a jury could find for Plaintiff under a hostile work environment theory, as a reasonable jury could find that Wade's sexual and gender-based harassment of Plaintiff was "sufficiently severe or pervasive to alter the terms and conditions of employment.

To demonstrate sexual harassment under a hostile work environment theory, Plaintiff must show: (1) that "she belongs to a protected group;" (2) that she "has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;" (3) that the harassment was "based on [her] sex …;" (4) "that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) "a basis for holding the employer liable." "Appalling conduct alleged in prior cases does not mark the boundary of what is actionable."

The Eleventh Circuit, following the lead of the Supreme Court, has cautioned against attempts by Defendants to reduce Title VII harassment cases to sterile, numbered lists of events, noting that "the Supreme Court has provided a non-exclusive set of factors to consider in determining whether an environment is

hostile. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." However, the harassment need not be so extreme that it produces tangible effects in job performance in order to be actionable.

Here, the "totality of the circumstances" includes Wade's threatening and abusive behavior, and his physically abusive relationship with Miller. During the time when Plaintiff was working for Defendant, Miller and Wade were in counseling and dating intermittently even following his domestic violence arrest for strangling her in 2016. Placing Plaintiff squarely in the middle of the abusive dynamic, Miller assigned Plaintiff to go out and feel the hood of Wade's car and other personal tasks relating to keeping tabs on Miller's and Wade's personal relationship, in effect using Plaintiff to "keep an eye on Mason."

A reasonable jury could further infer that Wade's sexual harassment of Plaintiff was one of the ways in which this strangler of women sought to intimidate and control Miller, making his harassment of Plaintiff even more physically threatening and humiliating than it would otherwise have been.

Furthermore, the Faragher/Ellworth defense is not available here because Plaintiff suffered a tangible employment action. This is because "when a supervisor engages in harassment which results in an adverse 'tangible employment action' against the employee, the employer is automatically held vicariously liable for the harassment."Even if Plaintiff had not suffered a tangible employment action when she was terminated, Defendant cannot meet its burden of establishing the affirmative defense. "[D]issemination of an employer's anti-harassment policy [is] fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment," but Defendant had no sexual harassment policy and had never trained employees such as Wade or Plaintiff regarding sexual harassment.

<u>Plaintiff's Retaliation Claim</u>

To make out a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action

are not wholly unrelated." The Supreme Court has held that Title VII retaliation claims must be proved according to principles of but-for causation, not the lessened "substantial factor" causation test stated in §2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

Here, Plaintiff has shown the kind of "extremely close" temporal proximity sufficient both to establish a prima facie case, show "but for" causation, and to allow a reasonable jury to infer pretext. As stated by the Eleventh Circuit, an adverse employment action taking place "within days—or at the most within two weeks—of his protected activity can be circumstantial evidence of a causal connection between the two" sufficient to establish both a prima facie case and also relevant to establish pretext. Plaintiff has shown a very close temporal proximity of less than two days between her sexual harassment report and her termination. Accordingly, she has established both a prima facie case, but-for causation, and pretext.

The vagueness of Defendant's articulated reason denies Plaintiff the opportunity to meet and rebut Defendant's reasons and show pretext. Accordingly, Defendant has failed to meet its burden of "articulat[ing] a nondiscriminatory reason with 'sufficient clarity' to afford the employee a realistic opportunity to show that the reason is pretextual."

However, to the extent Defendant has succeeded in its burden of articulating a sufficiently specific reason for terminating her employment, a reasonable jury could find that Defendant's explanation that it fired Plaintiff because she "messed up" is pretext for retaliation. By contrast with the months that elapsed between Plaintiff's only written discipline and her firing, Plaintiff's termination came a mere two days after she made her sexual harassment report. Establishing the required "but for" causation, the timing of Plaintiff's termination just two days after Plaintiff raised her sexual harassment concerns with Miller supports an inference that Plaintiff's protected activity, not any other asserted reason, was the true "but for" cause of the decision to terminate her employment.

### Plaintiff's Damages and Other Relief

On her Title VII claims, Plaintiff seeks an award of backpay, along with compensatory and punitive damages in an amount to be determined by the jury, up to the applicable damages cap of the Defendant named in this case and any other

associated enterprises from which the total number of employees should be counted for liability purposes. Plaintiff also seeks reinstatement into the position she would occupy in the absence of sex harassment and retaliation, and/or frontpay to the extent reinstatement is impracticable. Finally, Plaintiff seeks a fully compensatory award of her reasonable attorney's fees and costs pursuant to Title VII and 42 USC § 1988.

Plaintiff is entitled to punitive damages on her claims brought under Title VII because Defendant and/or its employees acting in a high level managerial capacity acted with either malice or with reckless indifference toward Plaintiff's federally protected rights. Defendants showed a blatant disregard for civil legal obligations, failed to investigate reports of sexual harassment, and failed to take corrective action concerning harassing acts by its manager. In addition, Defendant lacked an effective policy prohibiting harassment.

As to Defendant's contentions of "spoliation" or attempting to "bribe" a witness, this never occurred. Defendant has produced two audio interviews of Ronald Holman. In one conversation recorded by Ms. Miller, Holman, who is audibly intoxicated, accuses an unspecified male attorney of telling him that the plaintiff's lawsuit was worth "millions" and that he would be compensated if he testified in her favor. In another recorded interview conducted by defense counsel, Holman changes his story and accuses Plaintiff herself of offering to make it "worth his while" if he prevailed. Each of these contentions is false.

(b) <u>The Defendant:</u> Alachua Straw denies generally the statements of alleged fact made in Plaintiff's Contentions stated herein. The Plaintiff has testified that along with the addition of two other alleged incidents, the facts as stated in the Complaint form the factual basis of her claims against Alachua Straw. Therefore, inasmuch as the Plaintiff's recitation of the incidents in her complaint comprise the factual basis of the Plaintiff's claims, at the trial of this case Alachua Straw will address each material fact cited in the Complaint. Alachua Straw contends that the allegations of fact as stated by Plaintiff in her pretrial contentions herein are either mischaracterized or are simply untrue, as the evidence presented at trial will show.

Alachua Straw contends that there is no evidence, no testimony by Plaintiff that Wade "started telling her how much he liked her body" as is alleged in the Complaint. Although Plaintiff alleges that she made it clear to Wade that his sexual and sexist remarks were not welcome and made her uncomfortable, Plaintiff

8

testified that she ignored the comment.  She did not report the comment to Andi Miller when Wade made it.  She admitted that she only reported the  comment to Andi Miller later, when she "came forward . . . came clean with everything.

Alachua Straw contends that while Plaintiff claims that Mason Wade told her he was going to take off his belt and "whoop her ass," Plaintiff does not know if Wade was saying it in jest.   She could not remember if she had messed something up.  She doesn't know if Wade was disappointed in her for some reason.  All Plaintiff could say is, " I don't know how he was feeling when he said it, I'm not him".  Andi Miller was there when Mason said, "I'm going to whoop your ass."  At that time Miller told Wade not to say that.

Regarding Plaintiff's theories of harassment, Alachua Straw denies the facts as stated in Plaintiff's contentions herein.  Plaintiff claims that she was subjected to sexual harassment and gender harassment, and suffered a tangible employment action for rejecting the sexual advances and retaliated against for reporting sexual harassment.   However, Plaintiff actually admitted that there were no sexual advances made by Mason Wade.  Alachua Straw further contends that Plaintiff actually participated in and contributed to the "severe or pervasive conduct,"  the atmosphere, in the office through her own conduct and statements, including but not limited to lifting her clothing to expose parts of her body, Showing explicit pohotos and discussing her boyfriend/husband's sexual affairs (Plaintiff admitted that she and Miller were commiserating about problems with men) and flirting with drivers or making suggestive comments about certain drivers.   Plaintiff admitted that she felt nothing about comments allegedly made by Mason Wade, that she ignored them.   While Plaintiff contends that "if a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of "severe or pervasive," Alachua Straw contends that Plaintiff admitted under oath that:  (1) Mason Wade never touched her;  (2) Wade never asked her on a date; (3) Wade never asked her to have sex with him;  (4) Wade never asked her to kiss him; (5) Wade never tried to kiss her; (6) Wade never put his arms around her and try to make an advance on her and try to kiss her;  (7) Wade never tried to hold her hand;  (8) Wade never tried to hold her or squeeze her in such a way as to make a sexual advance on her;  and (9) Wade never told her that he would like to do anything of a personal nature with her.  Alachua Straw contends that Plaintiff will admit that **Wade never told her that her employment was in jeopardy if she did not do something with him.**  Alachua Straw contends

that Plaintiff will admit that Mason Wade never said anything to Plaintiff about "if you want to keep your job, you have to have sex with me", or anything like that. Alachua Straw contends that Plaintiff will admit that Mason Wade never said anything to Plaintiff about "if you want to keep your job, you have to go on a date with me". Alachua Straw contends that Plaintiff will admit that Mason Wade never said anything to her about "if you want to keep your job, you have to do anything of a personal nature with him or for him".

With regard to the claim for retaliatory discharge, Alachua Straw asserts, *inter alia,* that Tyson's termination was based entirely on Plaintiff's poor performance. Alachua Straw contends that, even assuming for argument sake that Plaintiff could establish a prima facie case of disability discrimination (which she cannot), Plaintiff cannot overcome Alachua Straw's legitimate, nondiscriminatory reasons for her termination. The burden of producing a legitimate, nondiscriminatory reason that rebuts an employee's prima facie case of discrimination is relatively low. An employer does not need to "prove" the absence of a discriminatory motive to meet its burden. Rather, it need only articulate a legitimate, nondiscriminatory reason for the adverse action. As long as the evidence "could allow a rational fact finder to conclude" that the action was not based on a discriminatory motive, the court must accept the employer's explanation. Alachua Straw terminated Plaintiff's employment after she "messed up" several times. As such, Alachua Straw has a legitimate, nondiscriminatory reason that Plaintiff cannot refute. Plaintiff's incompetence was exhibited in the fact that six weeks before Plaintiff was terminated she missed a "live unload" with one of the Defendant's largest client. Mere days before was terminated Plaintiff sent an empty trailer to Red Level, Alabama. These are but a few of the examples of Plaintiff's poor job performance, all of which will be introduced at trial. Plaintiff, in fact, admits that she was unable to perform the tasks of her job. Alachua asserts that Plaintiff's alleged reporting of alleged harassment played no part in its decision to terminate Plaintiff. Alachua Straw affirmatively contends that no action taken with respect to Plaintiff was unlawful, willful, malicious, or with reckless indifference as a matter of law.

Alachua Straw contends that based on the *Ellerth/Farragher* affirmative defense, Alachua Straw contends that even if Mason Wade's conduct towards Plaintiff is deemed to be sexual harassment (to which this Defendant denies), the undisputed facts in this case corroborate that Alachua Straw did not authorize or ratify his actions, that they occurred without its knowledge, that Plaintiff delayed

in reporting the alleged harassing behaviors, and that they were committed beyond the scope of Mason Wade's employment. Plaintiff has waived and is estopped from bringing her claims in this case because she did not report her allegations about Mason Wade to Alachua Straw in a timely manner.

Alachua Straw contends that Plaintiff admits that she did not complain about any sexual harassment to Andi Miller until the June 4/5 meeting, and that was she was discharged before the end of her probationary period.

These pretrial contentions are not intended to be a complete recitation of all evidence and arguments that will presented at trial.  The Defendant reserves the right to present such evidence as is necessary for a full and fair trial of this cause. Alachua Straw hereby gives notice that it intends to rely on any other such defenses that may become available or apparent during the course of the trial, and thus reserves the right to amend this pleading to assert such defenses as they conform to the evidence.  Alachua Straw further adopts by reference any factual allegations, contentions or arguments made in its Motion for summary judgment.

Alachua Straw also contends that Plaintiff is guilty of spoliation of evidence and/or attempting to bribe at least one material witness.  Defendant has produced evidence of Plaintiff offering her key witness that if he testified favorably for her and if she recovered any money that she would "make it worth his while". Defendant contends that Plaintiff's Attempt to bribe a "key" witness are grounds enough for dismissal; of this case.

Alachua Straw seeks entry of judgment in its favor, attorneys' fees, costs, and expenses incurred in defending this action.

6.   <u>**STIPULATIONS BY AND BETWEEN THE PARTIES:**</u>

(a) Plaintiff began working for Defendant as a dispatcher and freight coordinator in early March 2017.

(b) Andrea Miller is the owner of Alachua Straw Company.

11

(c)  During the period of time relevant to this action, Mason Wade was the production manager of the defendant.

(d)  Mason Wade, Jr. had authority to discipline Plaintiff.

(e)  Mason Wade, Jr. and Andrea Miller were involved in the decision to terminate Plaintiff's employment.

**\*\*\***

It is ORDERED that:

(1) The jury selection and trial of this cause, which is to last 3 days, are set for May 11, 2020, at 10:00 a.m. at the United States Courthouse in Montgomery, Alabama;

(2) A trial docket will be mailed to counsel for each party approximately two weeks prior to the start of the trial term;

(3) Each party shall have available at the time of

12

trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk), three copies of the exhibit list and a sufficient number of copies of each photostatically reproducible exhibit for opposing counsel, the courtroom deputy clerk, the law clerk, the jurors, and the judge to each have a set of the exhibits;

(4) Trial briefs ((a) summarizing the evidence to be presented at trial, (b) setting forth the elements of each and every claim and defense at issue and how the evidence does or does not satisfy those elements, and (c) addressing any evidentiary issues that may arise at trial) are required to be filed by April 27, 2020;

(5) All deadlines not otherwise affected by this order will remain as set forth in the uniform scheduling order (doc. no. 10), as modified (doc. no. 12) by the court on February 27, 2019; and

(6) All understandings, agreements, deadlines, and

13

stipulations contained in this pretrial order shall be binding on all parties unless this order be hereafter modified by order of the court.

DONE, this the 13th day of March, 2020.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE